UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI


UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )  Case No.
                                    )  17-00132-01-CR-W-BP
EDWARD J. GLEASON,                  )
                                    )
                Defendant.          )



        TRANSCRIPT OF CHANGE OF PLEA HEARING
         BEFORE THE HONORABLE BETH PHILLIPS
            UNITED STATES DISTRICT JUDGE
                  JULY 14, 2020
               KANSAS CITY, MISSOURI

                  APPEARANCES

FOR THE PLAINTIFF:
    MS. ALISON D. DUNNING
    United States Attorney's Office
    Charles Evans Whittaker Courthouse
    400 East Ninth Street, Floor 5
    Kansas City, Missouri 64106


FOR THE DEFENDANT:
    MR. JOHN R. OSGOOD
    112 SW 3rd Street
    Lee's Summit, Missouri 64063




    Proceedings recorded by mechanical stenography, transcript
produced by computer



                KATHERINE A. CALVERT, RMR, CRR
                 FEDERAL OFFICIAL COURT REPORTER
                CHARLES EVANS WHITTAKER COURTHOUSE
                    400 EAST NINTH STREET
                 KANSAS CITY, MISSOURI 64106

1

```
 1                          JULY 14, 2020

 2              THE COURT:  Thank you.  Please be seated.

 3              Are we ready to proceed?

 4              MR. OSGOOD:  Your Honor, I think Mr. Gleason is

 5   prepared to enter his plea of guilty to the four counts

 6   straight up.

 7              THE COURT:  With no plea agreement?

 8              MR. OSGOOD:  No plea agreement.

 9              THE COURT:  Okay.  Does the government have any

10   position that you want to make on this issue?

11              MS. DUNNING:  I don't know that I can.

12              THE COURT:  I don't know either, but I wanted to

13   give you the opportunity to make one if you felt the

14   opportunity to -- or felt the need to do so.

15              MS. DUNNING:  I would probably make a -- there's

16   been no -- is this fine to be -- I guess it's open court.  So

17   there's been no -- I feel weird.

18              THE COURT:  It's open court and we're on the record,

19   and I believe that, unless I hear otherwise --

20              THE COURTROOM DEPUTY:  Now I've unmuted it.

21              MS. DUNNING:  I'm not asking for that.  I was just

22   processing out loud, which I shouldn't have done.

23              THE COURT:  We need to have open court so we are now

24   officially open.

25              MS. DUNNING:  Thank you.
```

2

1    So the only record I would make about it, and we

2    don't have to do it now, is just when we are on the record if

3    there is a plea, just that there's been no prior written

4    agreement.  We've just had discussions today.

5            THE COURT:  Then today is the first day that you've

6    had any discussions regarding a potential plea?

7            MS. DUNNING:  No, but we never really had a formal

8    written agreement we passed back and forth.  So that's the only

9    thing I would say about it.

10           THE COURT:  Okay.  Well, I don't know of any reason

11   that Mr. Gleason can't plead guilty at this point.

12           I will say that -- well, I don't think I need to say

13   anything at this point.

14           Mr. Gleason, you overheard the conversation that

15   I've had with your attorney; is that correct?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  And is your attorney correct when he

18   says that you wish to change your plea of guilty in Counts 1

19   through 4 from not guilty to guilty?

20           THE DEFENDANT:  Yes.

21           THE COURT:  If you could give me just a couple of

22   minutes and let me pull up the indictment and a few other forms

23   here.

24           Okay, sir, before I can accept your plea, I need to

25   ask you a series of questions.  I'm sure that you understand

```
1   the charges that you're pleading guilty to; that you understand

2   the range of punishment for those charges; and that you

3   understand the consequences of pleading guilty so that I can

4   determine whether your plea is a knowing and voluntary plea.

5   Okay?

6              THE DEFENDANT:  Okay.

7              THE COURT:  Before I do that, I'm going to ask that

8   the clerk swear you in.

9   EDWARD JAMES GLEASON, JR., being sworn by the courtroom deputy,

10  testified:

11  EXAMINATION BY THE COURT:

12  Q     Could you please state your full name.

13  A     Edward James Gleason, Jr.

14  Q     How old are you?

15  A     Forty-four.

16  Q     What's the highest grade you completed in school?

17  A     GED.

18  Q     And are you a citizen of the United States?

19  A     Yes, ma'am.

20  Q     Do you understand that now because you're under oath,

21  that any statement that you make that is false or untrue could

22  be used against you?  For example, for prosecution for perjury

23  or making a false statement?

24  A     Yes, ma'am.

25  Q     Have you ever suffered from any type of mental illness?
```

4

```
1    A      No.

2    Q      Have you ever suffered from an addiction?

3    A      Yes.

4    Q      It's my understanding that you're currently in custody;

5    is that correct?

6    A      Yes, ma'am.

7    Q      In the past 48 hours have you used any illegal drugs?

8    A      No.

9    Q      In the past 48 hours have you drank any alcohol?

10   A      No.

11   Q      Do you take any medicine on a regular basis?

12   A      No.

13   Q      In the past 48 hours have you taken any medicine?

14   A      No.

15   Q      Have you -- do you see a doctor for any reason on a

16   regular basis?

17   A      No.

18          THE COURT:  Mr. Osgood, in your opinion is your

19   client competent to enter a plea of guilty?

20          MR. OSGOOD:  Yes, ma'am.

21   Q      (By the Court)  Sir, I next want to make sure that you

22   understand the charges you're pleading guilty to.  Have you

23   received the indictments in this case?

24   A      Yes.

25          THE COURT:  And could you move that microphone a
```

5

1    little bit closer to him.

2    A      Yes, I have.

3    Q      (By the Court)  And have you discussed the indictment

4    with your attorney?

5    A      Yes.

6    Q      And do you understand that Count 1 charges that --

7            THE COURT:  I may use the time frame that was

8    contained in the proposed instruction.  Do you have any

9    objection to that?

10            MR. OSGOOD:  I don't, Your Honor.

11            THE COURT:  In light of the fact that the charges

12    were dismissed.

13            MS. DUNNING:  Yeah, I don't, Your Honor.

14            THE COURT:  Okay.

15    Q      (By the Court)  Do you understand that Count 1 charges

16    that between approximately October 1st, 2014, and March 12th,

17    2014, here in the Western District of Missouri and elsewhere,

18    you and your codefendants who are listed in this indictment did

19    knowingly and intentionally combine, conspire, confederate, and

20    agree with each other and others, both known and unknown to the

21    grand jury, to distribute 500 grams or more of a mixture or

22    substance containing a detectable amount of methamphetamine?

23    A      Yes.

24    Q      Do you understand that this charge carries with it a

25    range of punishment of not less than ten years in prison, up to

6

1    life, a fine of not more than $10 million, supervised release

2    of not less than five years, and a $100 mandatory special

3    assessment?

4    A      Yes.

5    Q      Do you understand Count 2 charges that on or about

6    February 16th, 2015, here in the Western District of Missouri,

7    that you knowingly and intentionally distributed a mixture or

8    substance containing a detectable amount of methamphetamine, a

9    Schedule II controlled substance?

10   A      Yes.

11   Q      Do you understand that Count 2, Count 3, and Count 4

12   all carry the same range of punishment?

13   A      Yes.

14   Q      So I'm going to move on to the elements of Count 3.  Do

15   you understand that Count 3 charges that on or about March 2nd,

16   2015, here in the Western District of Missouri, that you

17   knowingly and intentionally distributed a mixture or substance

18   containing a detectable amount of methamphetamine?

19   A      Yes.

20   Q      And do you understand that Count 4 charges that on or

21   about March 12th, 2015, here in the Western District of

22   Missouri, that you knowingly and intentionally possessed with

23   the intent to distribute 50 grams or more of a mixture or

24   substance containing a detectable amount of methamphetamine?

25   A      Yes.

7

1   Q      And do you understand that Counts -- well, excuse me.

2   I misstated that.

3             Do you understand that Counts 2 and 3 carry with

4   them a range of punishment of not more than 20 years in prison,

5   a fine of not more than $1 million, supervised release of not

6   less than three years, and each of them, again, carry a $100

7   mandatory special assessment?

8   A      Yes.

9   Q      And do you understand I misspoke a few moments ago when

10  I suggested that Count 4 carried the same range of punishment

11  as Counts 2 and 3?

12  A      Yes.

13  Q      Do you understand Count 4 actually carries with it a

14  range of punishment of not less than five years in prison, not

15  more than 40 years in prison, a fine of not more than $5

16  million, supervised release of not less than four years, and

17  another $100 mandatory special assessment?

18  A      Yes.

19  Q      So do you understand that if I accept your plea, I can

20  sentence you anywhere within this range of punishment?

21  A      Yes.

22  Q      Do you understand, however, that under no circumstances

23  can I sentence you to anything less than ten years to Count 1

24  and five years on Count 4?

25  A      Yes.

1    Q    I next want to ask you about the advice and

2    representation that Mr. Osgood has provided you in this case.

3    Are you satisfied with the advice and representation he's

4    provided you?

5    A    Yes.

6    Q    Sitting here today, do you have any concerns about the

7    advice and representation he's provided you?

8    A    No, ma'am.

9    Q    Is there anything Mr. Osgood has not done that you

10   specifically asked him to do?

11   A    No, ma'am.

12   Q    I next want to make sure you understand the rights that

13   you're giving up by pleading guilty.  Do you, first of all,

14   understand that you have a right to continue to plead not

15   guilty and we could move forward with this trial that we've

16   started?

17   A    Yes.

18   Q    Do you understand that if you -- that if we move

19   forward with this trial, that you will be presumed innocent and

20   the government will have to prove your guilt beyond a

21   reasonable doubt?

22   A    Yes.

23   Q    Do you understand that at the trial you will have the

24   right to an attorney to assist you during all steps of the

25   trial?

1    A       Yes.

2    Q       And do you understand that if we had a trial, you would

3    have the right to see, the right to hear, and the right to

4    cross-examine all of the witnesses that the government produced

5    to testify against you?

6    A       Yes.

7    Q       Do you also understand that if we had a trial, you

8    could use the power of the Court to subpoena people and/or

9    documents to court that you could present to the jury in your

10   own defense?

11   A       Yes.

12   Q       And, lastly, do you understand that if we had a trial,

13   you could choose not to testify?

14   A       Yes.

15   Q       Do you understand that if you chose to not testify, I

16   would instruct the jury that they could not hold that fact

17   against you and you would still be presumed innocent?

18   A       Yes.

19   Q       Do you understand that by pleading guilty, you are

20   giving up all of these rights to a jury trial?

21   A       Yes.

22   Q       Do you also understand that because the charge you're

23   pleading guilty to is a felony offense, you may be giving up

24   valuable civil rights, such as the right to vote, the right to

25   hold office, the right to serve on the jury, and the right to

1   possess a firearm?

2   A       Yes.

3   Q       I next want to talk with you about the process that I

4   will use to decide your sentence if I accept your guilty plea.

5   Have you and Mr. Osgood discussed that process?

6   A       Little bit.

7   Q       Okay.  For example, have the two of you discussed the

8   federal sentencing guidelines?

9   A       Not entirely.

10  Q       Has he shared with you how he believes the guidelines

11  will be calculated in your case?

12  A       I don't think we have a full understanding as to what

13  it would be right now.

14  Q       Okay.  So do you understand if I accept your guilty

15  plea, I am going to ask the Office of Probation and Parole to

16  conduct a presentence report?

17  A       Yes.

18  Q       Do you understand that as a part of that presentence

19  investigation, they will do a presentence report and a

20  preliminary calculation of your sentencing guidelines?

21  A       Yes.

22  Q       And so you understand that until we go through that

23  process, not your attorney, not the attorney for the

24  government, not even I can tell you how I'm going to calculate

25  those guidelines?

```
 1    A        Yes.

 2    Q        So are you telling me that right now you recognize that

 3    you don't know how those guidelines are going to be calculated?

 4    A        I do and I don't.

 5    Q        Okay.  You have an idea that Mr. Osgood has given you;

 6    is that fair?

 7    A        Yes.

 8             MR. OSGOOD:  Excuse me, Your Honor.  One of the

 9    things obviously that surfaces in this case is relevant

10    conduct.  Mr. Gleason does understand the concept of relevant

11    conduct, and he's heard the facts in this case.

12             Is that right, Mr. Gleason?

13             THE DEFENDANT:  Yes.

14    Q        (By the Court)  Okay.  So you understand that there

15    have been no promises to you as to how the guidelines are going

16    to be calculated in your case?

17    A        No.  I do understand that.

18    Q        You understand that, that there have been no promises

19    to you?

20    A        Yes.

21    Q        And you further understand that the guidelines are only

22    advisory, which means that I'm not required to follow the

23    sentencing guidelines?

24    A        Yes.

25    Q        So do you understand that regardless of how the
```

1  guidelines are calculated, what I'm required to do is impose a

2  sentence that I believe is reasonable in considering a number

3  of factors under federal sentencing law?

4  A      Yes.

5  Q      Do you understand that if I decide a reasonable

6  sentence is one that's actually higher than the sentencing

7  guidelines, that that will not be a basis for you to withdraw

8  your guilty plea?

9  A      Yes.

10 Q      Do you also understand that if the guidelines come back

11 differently than what you had predicted, even though you

12 recognize that it's an unknown, that regardless of how the

13 guidelines are calculated, that that will not be a basis for

14 you to withdraw your guilty plea?

15 A      Yes.

16 Q      Do you also understand that any sentence of

17 imprisonment that I impose is going to be followed by a term of

18 supervised release?

19 A      Yes.

20 Q      And have you talked with -- in fact, you've been on

21 supervised release before, haven't you?

22 A      Yes.  Yes.

23 Q      So you understand that when you're on supervised

24 release, there's certain things you can do and certain things

25 you can't do?

```
 1    A       Right.

 2    Q       And you understand that if you don't meet the

 3    requirements of supervised release, I may revoke your

 4    supervised release and send you back to prison?

 5    A       Right.

 6    Q       And do you understand that if we get that situation

 7    where I have to revoke your supervised release and send you

 8    back to prison, that you won't get any credit for any good time

 9    that you were on supervised release?

10    A       Right.

11    Q       Now, obviously this is a little bit unusual because

12    we've heard testimony from one witness in this case and you

13    have decided to change your plea.  Have you discussed your

14    options with your attorney, Mr. Osgood?

15    A       Yes.

16    Q       And have you knowingly decided to give up your right to

17    a jury trial and instead plead guilty to these charges?

18    A       Yes.

19    Q       And do you have any reservation regarding the decision

20    you've made pleading guilty to these charges?

21    A       No.

22            THE COURT:  Ms. Dunning, could the government

23    establish the factual basis you would prove if this case were

24    to go to trial?

25            MS. DUNNING:  Yes, Your Honor.  Is it okay -- is it
```

1    okay if I stay seated?

2            THE COURT:  Sure.  Again, it's most important to

3    speak into the microphone.

4            MS. DUNNING:  The government would present evidence

5    in this case that the Kansas City, Missouri Police Department

6    began an investigation of Mr. Gleason for methamphetamine

7    trafficking in January of 2015.

8            After conducting surveillance of him on

9    February 16th, they pulled over a person who had just met with

10   Mr. Gleason for a short time.  She had gotten into his car,

11   remained for a short time, and exited.  That person, Robyn

12   Phalen, was then stopped by the police officers and 6.8 grams

13   of methamphetamine was located concealed in her bra.

14           Officers had seen Mr. Gleason leave his home and drive

15   a short distance to meet with Phalen where he met with her for

16   a very short time before she was pulled over.  So that would be

17   the basis for Count 2.

18           The location of the meeting place at St. John and

19   Oakley Avenue is within the Western District of Missouri.  Mr.

20   Gleason was identified and was also seen driving a vehicle only

21   he was known to drive.

22           The detective would testify that the conduct that he

23   witnessed with the short meeting was consistent in his long

24   experience with being a hand-to-hand drug transaction.

25           A short time later, on March 2nd, 2015, officers

1   conducted a controlled buy using a confidential informant and

2   an undercover detective who met with Mr. Gleason at a location

3   very close to Mr. Gleason's home, also in the Western District

4   of Missouri.

5           The confidential informant drove with the undercover

6   detective where they met with Mr. Gleason who arrived in his

7   own vehicle.  The confidential informant was searched both

8   before and after the transaction.  No drugs or separate money

9   of his own was located on his person.  He met with Mr. Gleason

10  for a short period of time.  Undercover could monitor the

11  transaction and believed that he heard an exchange of money for

12  methamphetamine.

13          The confidential informant came back to the vehicle

14  and had about 3.3 grams of methamphetamine on his person and no

15  longer had the hundred dollars of buy money, and that took

16  place in the Western District of Missouri, and Mr. Gleason was

17  observed and identified by surveillance detectives, again, in

18  the same vehicle as from February 16th of 2015.  That would be

19  the basis for Count 3.

20          On March 11th a search warrant was executed and

21  exactly 21,836 -- well, $21,896 was located in Mr. Gleason's

22  residence along with some other evidence of drug trafficking

23  and specifically packaging of bulk currency; saran wrap, and

24  rubber bands.  The money was seized and counted, and the buy

25  money from the March 2nd, 2015, transaction was located

16

1   concealed in a large amount of currency that was hidden in Mr.

2   Gleason's home.

3           Mr. Gleason was arrested on the same day and

4   interviewed, and at that time he admitted that he had been

5   involved in a conspiracy to distribute methamphetamine -- not

6   by those words, but he admitted that he had a source that he

7   had been going back and forth to for about five and a half

8   months at that point. He named that person by name, address,

9   and phone number. And while detectives later believed that

10  that was not accurate information as to the person, the

11  evidence was consistent with what he described based on the

12  amount of money that they found, the amount of drugs that he

13  discussed, and what they had seen him interacting with the two

14  individuals on the previous dates.

15          Additionally, Mr. Gleason advised them that he was

16  storing methamphetamine at the home of a separate person,

17  Crystal Altamirano, that he had about one pound of

18  methamphetamine there, which, again, they confirmed by

19  contacting Ms. Altamirano. Mr. Gleason exhibited his control

20  over that by telling Ms. Altamirano to turn that over to the

21  detectives, and it was in a location that was not known about

22  but for his statement. He identified Crystal Altamirano's

23  involvement as being someone who stored methamphetamine for him

24  and helped him arrange drug deals. So that would be the basis

25  for Count 4 because that methamphetamine that they recovered

1  was tested to be 490 grams.  So it was at least 50 grams but

2  not quite 500.

3          And overall all the evidence I've indicated

4  including Mr. Gleason's statement is the basis for Count 1.

5  Q      (By the Court)  Mr. Gleason, did you just hear the

6  statement of the attorney for the government?

7  A      Yes.

8  Q      And is everything she said true?

9  A      Yes.

10 Q      From on or about October 1st, 2014, to March 12th,

11 2015, did you engage in a conspiracy here in the Western

12 District of Missouri to distribute 500 grams or more of a

13 mixture or substance containing a detectable amount of

14 methamphetamine?

15 A      Yes.

16 Q      And on March 16th, 2015, here in the Western District

17 of Missouri, did you knowingly and intentionally distribute a

18 mixture or substance containing a detectable amount of

19 methamphetamine?

20         MS. DUNNING:  Your Honor, I just want to correct the

21 date.  I think you said March 16th and that's for Count 2.

22 It's February 16th.

23         THE COURT:  Yes.  I apologize.

24 Q      (By the Court)  I mean on February 16th of 2015 here in

25 the Western District of Missouri, did you knowingly and

1  intentionally distribute a mixture or substance containing a

2  detectable amount of methamphetamine?

3  A      Yes.

4  Q      And on or about March 2nd, 2015, here in the Western

5  District of Missouri, did you knowingly and intentionally

6  distribute a mixture or substance containing a detectable

7  amount of methamphetamine?

8  A      Yes.

9  Q      And, lastly, on or about March 12th, 2015, here in the

10  Western District of Missouri, did you knowingly and

11  intentionally possess with the intent to distribute 50 grams or

12  more of a mixture or substance containing a detectable amount

13  of methamphetamine?

14  A      Yes.

15  Q      Sir, we've now discussed the charges you're pleading

16  guilty to, we've discussed the range of punishment for those

17  charges, and we've discussed the consequences of pleading

18  guilty.  Knowing that information, how do you plead to Count 1

19  of the indictment, guilty or not guilty?

20  A      Guilty.

21  Q      And how do you plead to Count 2 of the indictment,

22  guilty or not guilty?

23  A      Guilty.

24  Q      How do you plead to Count 3 of the indictment, guilty

25  or not guilty?

1   A       Guilty.

2   Q       And how do you plead to Count 4 of the indictment,

3   guilty or not guilty?

4   A       Guilty.

5   Q       Are you pleading guilty to these charges because you

6   are in fact guilty?

7   A       Yes.

8   Q       Has anyone made any promises to you which have caused

9   you to plead guilty?

10  A       No.

11  Q       Anyone made any threats or forced you to plead guilty?

12  A       No.

13  Q       Then I find that you're fully competent and capable of

14  entering an informed plea; that you're aware of the nature of

15  the charges and the consequences of the plea; and that your

16  plea of guilty is a knowing and voluntary plea supported by an

17  independent basis in fact containing each of the essential

18  elements of the offense.  I therefore find you guilty of the

19  offenses charged in Count 1, 2, 3 and 4 of the indictment.

20              As I said, I'm going to ask the Office of Probation

21  and Parole to conduct a presentence investigation.

22              Kelly, are we prepared to set sentencing or should

23  we do so later?

24              THE COURTROOM DEPUTY:  I'll set it.

25              THE COURT:  We will set sentencing, Mr. Gleason.  I

1    would expect it to be somewhere in the range of 120 days is

2    what it typically takes to get the presentence report

3    completed, to get the input of you and your attorney and that

4    of the government so that we can proceed with sentencing.

5              Is there anything further on the part of the

6    government?

7              MS. DUNNING:  I would just incorporate the record I

8    made before in terms of the negotiations; but other than that,

9    I have nothing further.

10             THE COURT:  Okay.  Mr. Osgood, is there any further

11   record on your behalf?

12             MR. OSGOOD:  The issue came up previously about the

13   concept of constructive possession.  Mr. Gleason and I

14   discussed that.  I sent him some case law on that.  So he

15   understands that the amphetamine Was constructively possessed

16   by him.

17             Is that right?

18             THE DEFENDANT:  Uh-huh.  Yes.

19             THE COURT:  Okay.  If there is nothing further, then

20   that will conclude this matter at this time, and everyone can

21   have a good rest of the afternoon.

22             MS. DUNNING:  Thank you.

23             (The Court adjourned at 1:35 p.m.)

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Katherine A. Calvert, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings in UNITED STATES OF AMERICA, Plaintiff, vs. EDWARD J. GLEASON, Defendant, No. 17-00132-01-CR-W-BP.

Dated this 1st day of September, 2020.

_____
KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER